IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

_____

| | | |
|---|---|---|
| ALLEN POTTER, | ) | Cause No. CV 11-151-M-DWM-JCL |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | FINDINGS AND RECOMMENDATION |
| | ) | OF U.S. MAGISTRATE JUDGE |
| WARDEN SAM LAW; | ) | |
| ATTORNEY GENERAL OF | ) | |
| THE STATE OF MONTANA, | ) | |
| | ) | |
| Respondent. | ) | |

_____

On November 16, 2011, Petitioner Allen Potter moved to proceed in forma pauperis with this action for a writ of habeas corpus under 28 U.S.C. § 2254. Potter is a state prisoner proceeding pro se.

On December 23, 2011, Respondent ("the State") was ordered to file certain documents from the state courts' records and permitted, but not required, to file an Answer or motion to dismiss. Order (doc. 5) at 2. The State chose to file the documents.

# I. Preliminary Screening

Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts requires courts to examine the petition before ordering the respondent to file an answer or any other pleading. The petition must be summarily dismissed "[i]f it plainly appears from the face of the petition and any attached exhibits that the petitioner is not entitled to relief in the district court." *Id.*

A petitioner "who is able to state facts showing a real possibility of constitutional error should survive Rule 4 review." *Calderon v. United States Dist. Court,* 98 F.3d 1102, 1109 (9th Cir. 1996) ("*Nicolaus*") (Schroeder, C.J., concurring) (referring to Rules Governing § 2254 Cases). Consideration under Rule 4 "may properly encompass any exhibits attached to the petition, including, but not limited to, transcripts, sentencing records, and copies of state court opinions. The judge may order any of these items for his consideration if they are not yet included with the petition." Advisory Committee Note (1976), Rule 4, Rules Governing § 2254 Cases. "[I]t is the duty of the court to screen out frivolous applications and eliminate the burden that would be placed on the respondent by ordering an unnecessary answer." *Id.*; *see also* 28 U.S.C. § 2243.

# II. Background

On July 7, 2005, Potter entered the home of his therapist and friend, Lindsay

Clodfelter, and assaulted her.  Investigating officers found significant amounts of aspirated blood in small clusters on the walls and floors of Clodfelter's home but little blood on Potter.  Trial Tr. at 208:2-209:24, 235:16-21, 237:10-14, 254:18-255:11. They photographed injuries to Clodfelter's face and head.  *Id.* at 146:5-148:17.  When Potter was arrested, he admitted hitting Clodfelter with an open hand and admitted she may have hit her head on the wall once, but he denied striking her head against the floor and wall.  *Id.* at 242:23-243:16.  Clodfelter testified at trial that Potter beat her head against the floor and walls of her home.  *Id.* at 158:2-4, 160:16-21, 163:14-25.  Although she was hospitalized only for observation on the first night after the incident, she suffered multiple injuries, including, as later testing revealed, significant cognitive impairment, described in more detail below.

On July 27, 2005, Potter was charged in Montana's Fourth Judicial District Court, Missoula County, with one count of aggravated assault, one count of assault with a weapon, and one count of obstructing the officers who arrested him. Information (doc. 7-2).  Attorney Martin W. Judnich was appointed to represent Potter.  Trial Court Docket (doc. 7-1) at 1 Entry No. 5.

On October 20, 2005, the State filed a persistent felony offender notice.  Trial

Court Docket at 2 Entry No. 17; Resp. Br. (doc. 7-17 at <u>33</u>)[1] (Notice). Filing of the notice subjected Potter to a sentence of five to one hundred years in addition to the sentences available for the crimes of conviction. Mont. Code Ann. § 46-18-502 (2005); *State v. Gunderson*, 237 P.3d 74, 84 ¶¶ 54-55 (Mont. 2010).

On January 23, 2006, the State filed an Amended Information, substituting criminal endangerment for the original charge of aggravated assault as to Count 1.[2] Counts 2 and 3 remained the same. Am. Information (doc. 7-5) at 1-2. On March 14, 2006, the State moved in limine to exclude any mention of a sexual relationship between Potter and Clodfelter. On March 17, 2006, the State filed a Second Amended Information, charging one count of aggravated assault and abandoning all other charges. The Second Amended Information did not specifically identify expert witnesses, but it listed Clodfelter's physician, Dr. Beth Thompson, M.D., and Mary Burke, R.N., as possible witnesses. Neither of these persons had been listed as potential witnesses on the previous informations. *Compare* Second Am. Information

---

[1] Underlined page numbers refer to the page numbers as designated by the Court's electronic filing system. Page numbers that are not underlined refer to the page number as given in the cited document itself.

[2] Aggravated assault required proof of serious bodily injury. Criminal endangerment required proof that the defendant created a serious risk of death or serious bodily injury. *Compare* Mont. Code Ann. § 45-5-202(1) *with id.* § 45-5-207(1) (2005).

(doc. 7-6) at 2 *with* Am. Information at 2, Information at 2.[3]  On March 20, 2006,

Judnich sought and obtained authorization to hire a medical doctor as an expert.  Mot.

(doc. 7-7); Order (doc. 7-8).  On March 24, 2006, he filed a "Notice of Expert

Witness List" naming Dr. Ward DeWitt, M.D., an ear, nose, and throat specialist who

also practiced facial plastic surgery and head and neck surgery.  Notice (doc. 7-9);

Trial Tr. at 368:17-369:1.

Apparently at some point between March 23 and mid-April 2006, the State

notified Judnich that it had retained a clinical neuropsychologist, Dr. Paul Bach, to

evaluate and testify about Clodfelter's psychological injuries.  On May 18, 2006,

Judnich filed a second motion for authorization to hire an expert, pointing out that

"[t]he State has obtained the services of a Neurologist that has made factual findings

regarding injuries in this case."  Mot. (doc. 7-10).  The motion was granted.  Order

(doc. 7-11).  On July 24, 2006, Judnich filed a "Notice of Expert Witness List,"

naming neurologist Dr. Anthony Williamson, M.D.  Notice (doc. 7-12).

Shortly before trial, on August 22, 2006, the court granted the State's

unopposed motion in limine, filed the previous March, to exclude mention of an

---

[3]  The State may have informally advised Judnich, before it filed the Second Amended Information, that it would call Dr. Thompson and/or the RN, but no notice appears in the record or on the trial court's docket.  Similarly, there is no indication in the record or docket as to when the State disclosed that it would call clinical neuropsychologist Dr. Paul Bach as an expert witness.

intimate relationship between Potter and Clodfelter. Order Granting Mot. in Limine (doc. 7-21 at <u>18-19</u>).

Trial commenced on August 23, 2006, on the sole charge of aggravated assault. The State had to prove that Potter purposely or knowingly caused Clodfelter serious bodily injury. Mont. Code Ann. § 45-5-202(1) (2005). Potter did not contest the State's claim that he knowingly caused Clodfelter injury; his theory was that she did not suffer *serious* bodily injury. Judnich relied on cross-examination of the State's two medical witnesses, Dr. Beth Thompson and Dr. Paul Bach. He also presented Dr. DeWitt's testimony, who asserted that Clodfelter suffered no permanent or prolonged impairments or disfigurements to her face, neck, eyes, ears, or throat. The jury was instructed on aggravated assault, attempted aggravated assault, and simple assault. Trial Tr. at 404:11-22. On August 24, 2006, it found Potter guilty of aggravated assault. *Id.* at 459:10-23.

On November 2, 2006, a sentencing hearing was held. Judnich's objections to the persistent felony offender sentence were overruled. Potter was sentenced to serve the statutory maximum of twenty years for aggravated assault, without possibility of parole, plus fifty years as a persistent felony offender, with twenty of those fifty years suspended. Sentencing Tr. at 479:5-11; Appellant Br. (doc. 7-16 at <u>30</u>) (Judgment). He will serve at least twenty-seven years and six months before he becomes eligible

for parole. Mont. Code Ann. § 46-23-201(3).

Potter appealed, still represented by Judnich. He challenged the trial court's instructing the jury on attempted aggravated assault, the persistent felony offender sentence, and the sufficiency of the evidence as to serious bodily injury. Appellant Br. (doc. 7-16 at 8-9). On November 18, 2008, the Montana Supreme Court rejected Potter's arguments and affirmed his conviction and sentence. *State v. Potter*, 197 P.3d 471, 476 ¶ 35 (Mont. 2008).

On November 23, 2009, Potter, acting pro se, filed a petition for postconviction relief in the trial court. Trial Court PCR Docket (doc. 7-19) at 1 Entry No. 1. He alleged that Judnich was ineffective at trial and on appeal. He also asserted that his conviction and sentence were invalidated by prosecutorial misconduct and judicial bias. PCR Pet. (doc. 7-20) at 1.[4]

---

[4] Specifically, Potter asserted that Judnich should have interviewed knowledgeable witnesses and opposed the State's motion in limine to exclude at trial any evidence or testimony tending to show that Clodfelter unethically developed an intimate and ongoing relationship with Potter while she was working with him as a therapist hired by the State Department of Corrections to provide rehabilitative counseling. PCR Pet. at 5-12; *see also* PCR Pet. Ex. A (doc. 7-20 at 33) (traffic ticket for driving without a license issued to Potter at Clodfelter's address on June 19, 2005, at 12:10 a.m., allegedly in Clodfelter's car). Potter also alleged that Judnich failed to appeal the trial court's decision to let Dr. Bach testify despite the State's late disclosure of his reports and qualifications, *id.* at 12-13; failed to assert a speedy trial violation and forfeited Potter's right to be present when his speedy trial right was waived, *id.* at 12-14; failed to challenge the State's *Brady* violation in withholding a CT scan taken on July 17, 2005, ten days after the assault, failed to obtain the defense expert's opinion on anything shown by the July 17 as compared to the July 7 CT scan, failed to interview Drs. Birk and Brewington, who prepared reports on the CT scans, and failed to investigate an alternative cause of the atrophy noted in the CT scan, i.e., an episode of encephalopathy earlier in 2005, *id.* at 14-16; failed to interview the doctors who assessed Clodfelter's vertebrae, eye, and

The State moved to dismiss the petition for failure to comply with state pleading standards for postconviction petitions. On December 21, 2010, the trial court granted the State's motion and dismissed the petition. Order (doc. 7-25).

Potter appealed. He restated the claims in his petition and asked for a remand and the appointment of counsel to "investigate and present claims." Appellant Br. (PCR) (doc. 7-26 at 15). The State responded that Potter's petition failed "to meet the demanding pleading and procedural threshold of the postconviction statutes," Resp. Br. (PCR) (doc. 7-27 at 10), because his petition and attached documentation were not sufficient to prove his allegations by a preponderance of the evidence. The Montana Supreme Court agreed and, on August 23, 2011, affirmed the trial court's dismissal of the petition. Order at 3-4 ¶¶ 6-7, *Potter v. State*, No. DA 11-0012 (Mont. Aug. 23, 2011) (unpublished disp.) (doc. 7-28), *also available at* http://supremecourtdocket.mt.gov.

Potter timely filed his federal petition on November 10, 2011. Pet. (doc. 1) at 6, Pet'r Decl. ¶ C; *Houston v. Lack*, 487 U.S. 266, 270-71 (1988) (establishing prison mailbox rule).

---

hand, *id.* at 17-18; failed to obtain an expert opinion as to Clodfelter's psychological injuries, *id.* at 18; and failed to object to the State's calling a previously undisclosed witness, Margaret Borg, in its case-in-chief, *id.*

### III. Potter's Claims

Potter's first claim alleges that the jury should not have been instructed on attempted aggravated assault because it is not a lesser included offense of aggravated assault.  Pet. at 4 ¶ 15A.

Second, Potter contends that he should not have been sentenced as a persistent felony offender because the State did not give him adequate notice of the predicate conviction on which it relied.  *Id.* ¶ 15B.

Third, Potter claims the State did not introduce sufficient evidence to prove the element of "serious bodily injury."  Pet. Supp. (doc. 1-4) at 1.

Fourth, Potter asserts that Judnich provided ineffective assistance of counsel on appeal because he should have challenged the State's motion in limine both at trial and on appeal and because he failed to interview witnesses who could have testified at trial about the inappropriate relationship between Potter and Clodfelter.  *Id.* at 2.

Fifth, Potter avers that his right to a speedy trial was violated and Judnich was ineffective for failing to vindicate it.  *Id.* at 2-3.

Sixth, Potter contends that Judnich, the State, and the trial court violated his rights by allowing Margaret Borg, a previously undisclosed witness, to testify in the State's case-in-chief, and Judnich should have appealed this issue.  *Id.* at 3.

Seventh, Potter asserts that Judnich should have appealed the trial court's

decision to allow Dr. Bach to testify despite the State's late disclosure of him as an expert witness. *Id.* at 5. He also alleges that Judnich was ineffective because he failed to interview or present a psychiatric expert to rebut Dr. Bach's assessment of Clodfelter's psychological injuries. *Id.* at 5 (part of Ground Nine).

Eighth, Potter alleges that Judnich was ineffective at trial and violated his right to compulsory process because he failed to interview Drs. Brewington, Stern, Puckett, and Ross, who examined Clodfelter at the hospital, and so failed to discover exculpatory medical evidence. *Id.* at 3-4.

Ninth, Potter alleges a violation of the disclosure requirement of *Brady v. Maryland*, 373 U.S. 83, 87 (1963), on the grounds that the State did not produce to Judnich a CT scan performed ten days after the assault, on July 17, 2005. Pet. Supp. at 6.

Finally, Potter asserts that Judnich was ineffective at trial and on appeal because he allowed state witnesses "to testify using Dr. Brewington's dictated medical report," an "accusatory" document. *Id.* at 5 (part of Ground Nine).

## IV. Analysis

### A. Claims Decided on Direct Appeal

On direct appeal, the Montana Supreme Court decided the merits of Potter's first three claims. They are, therefore, subject to the stringent standards of 28 U.S.C.

§ 2254(d). Potter may obtain federal habeas relief only if the state court's denial of any of these claims "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if the state court's denial was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2).

## 1. Jury Instructions

The jury was correctly instructed to consider all the elements of aggravated assault first. Mont. Code Ann. § 46-16-607(3) (2005). It was to consider attempted aggravated assault and simple assault only if it was unable, after reasonable effort, to reach a verdict on aggravated assault. Resp. Br. App. C (doc. 7-17 at 40-41) (Jury Instr. 5-10). The jury convicted Potter of the greater offense of aggravated assault. Therefore, it did not consider the lesser offenses of attempted aggravated assault or simple assault. And the Montana Supreme Court's conclusion that Potter was not prejudiced by the instruction cannot be faulted. This claim should be denied.

## 2. Persistent Felony Offender Sentence

Potter alleges that the State "failed to give notice of seeking treatment as a persistent felony offender under the 2nd Amended Information." Pet. at 4 ¶ 15B. The Montana Supreme Court held that the State's notice procedure did not violate state

law. Neither this Court nor the United States Supreme Court may question the Montana Supreme Court's interpretation of Montana law. *See, e.g.*, *Wisconsin v. Mitchell*, 508 U.S. 476, 483 (1993) ("There is no doubt that we are bound by a state court's construction of a state statute."); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today we reemphasize that it is not the province of a federal habeas court to reexamine state court determinations on state law questions."). And even if the State had violated state law, Potter would not be entitled to federal habeas relief on that basis. *Wilson v. Corcoran*, __ U.S. __, 131 S. Ct. 13, 16 (2010) (per curiam); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).

Further, there was no due process violation. The State's initial notice adequately apprised Potter of the conviction on which the State would rely. He conceded the conviction was a qualifying predicate felony. He was not prejudiced by the State's erroneous statement of the date of the conviction as June 27, 2003, when it was actually July 9, 2003. *Cf. United States v. Baugham*, 613 F.3d 291, 295 (D.C. Cir. 2010). This claim should be denied.

### 3. Sufficiency of the Evidence

A state habeas petitioner is entitled to federal habeas relief "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324

(1979); *see also In re Winship*, 397 U.S. 358, 364 (1970) (federal Constitution requires "proof beyond a reasonable doubt of every fact necessary to constitute the crime . . . charged."). All of the evidence must be considered in the light most favorable to the jury's verdict. *Jackson*, 443 U.S. at 319.

Whether the evidence is sufficient to support a particular element beyond a reasonable doubt "must be gauged in the light of applicable [State] law defining the element." *Id.* at 324. At the time of the incident in July 2005, "serious bodily injury" meant bodily injury that:

> (i)    creates a substantial risk of death;
>
> (ii)   causes serious permanent disfigurement or protracted loss or impairment of the function or process of a bodily member or organ; or
>
> (iii)  at the time of injury, can reasonably be expected to result in serious permanent disfigurement or protracted loss or impairment of the function or process of a bodily member or organ.

Mont. Code Ann. § 45-2-101(66)(a) (2005). The term also included "serious mental illness or impairment." *Id.* § -101(66)(b).[5]

---

[5]  Throughout Dr. Beth Thompson's testimony, the State asked whether particular injuries created a "reasonable risk" of serious bodily injury. *E.g.*, Trial Tr. at 276:19-282:9; *see also, e.g.*, *id.* at 386:2-25. Assessment of "risk" is required by the criminal endangerment statute, not the aggravated assault statute, *see supra* note 2. Because an injury that gives rise to a "reasonable *risk*" of permanent or protracted loss or impairment may be less serious than one that "can reasonably be *expected* to result" in permanent or protracted loss or impairment, Dr. Thompson's testimony is not considered here.

The testimony of Dr. Paul Bach, a clinical neuropsychologist, was alone sufficient to establish serious bodily injury within the meaning of the state statute. Although Potter alleges various grounds on which Dr. Bach's testimony should have been challenged or excluded, the question at this point is simply whether his testimony, as given, supported the jury's verdict beyond a reasonable doubt. It did.

Dr. Bach assessed Clodfelter's cognitive functions about eight months after the assault. He found that she was "verbally a brilliant woman," with a verbal IQ higher than his own. Trial Tr. at 322:5-8. But he noted curious deficits:

Q.   So can you please discuss the significance of your findings . . . ?

A.   . . . When it comes to thinking with reasoning, with words, verbal intelligence, that sort of stuff we do in school all the time, that sort of stuff we do when we're interacting with each other on paper or – or verbally, this woman's a genius. . . . It really is impressive.
          . . . [H]er merely average nonverbal abilities, the ability to see how things fit together, to do things with her hands and eyes, visual spatial processing, is high average but not exceptional.
. . .
          Her memory's quite good as you'd expect, especially verbal memory. She recalls most everything that is said to her. The head injury did not seem to have a significant effect on memory.
          In both intelligence and memory testing, there are components in there that have to do with the ability to pay attention. In . . . those parts of the battery which had to do with attention, low average. Not bad. Get through life just fine. Average. Low average is still average.
          But then you start to compare that with this woman with this really formidable verbal intelligence and excellent memory,

14

> one suspects that there may be some modest deficit of attention
> and concentration . . .
>
> . . .
>
> . . . [Y]ou expect that she hasn't always paid attention,
> concentrated, at this lower level.
>
> . . .
>
> One percent of the human – 1% of the United States'
> population has attention, concentration, this low and memory as
> good as hers. That's a rare finding.

Trial Tr. at 322:3-19, 323:1-14, 324:2-4, 324:6-8.

On some verbal tests, Clodfelter performed as well as her high verbal IQ would

suggest. For instance, she did "quite well" when asked to name all the colors she

could think of in 30 seconds, "certainly equivalent with her significant verbal

intelligence." Trial Tr. at 326:14-327:1. But when asked to look at pictures of

objects and name them, "she [did] quite badly, totally inconsistent with that verbal IQ

of hers, totally consistent with a clinical complaint." *Id.* at 327:14-20. Her

functioning in that capacity was in the lowest possible bracket, the 1st percentile, of

women of her age with more than 16 years of education. He concluded, "Something

pathological is required to explain that sort of discrepancy" between her verbal

intelligence and her score on the naming test. *Id.* at 328:8-14, 355:19-22. Referring

to the July 17, 2005, CT scan, which showed "mild cerebral atrophy . . . especially in

the frontal regions," *id*. at 349:13-350:16, PCR Pet. (doc. 7-20 at 28), Dr. Bach

correlated her deficit in ability to name specific items with damage to the left frontal

lobe of the brain.  Trial Tr. at 352:1-3.

Dr. Bach also tested Clodfelter's ability to reason abstractly and concluded the results correlated to damage to the right frontal lobe:

A.      . . . [O]n one test referred to as the Wisconsin Card Sorting Test, where a really simple reasoning task is required but you have to be somewhat nimble and change it quickly, she did abysmally. Lower 1st percentile.

This particular task is relatively well correlated with patients who suffered damage or lesions to their frontal, especially right frontal lobe, and, lo and behold, when one reads her C[T] scan interpretation by the radiologist, this is where he found abnormalities and, lo and behold, that is one of the areas you would expect damage to occur as a result of a traumatic head injury as a result of an assault.

So three pieces of the puzzle appear to fit together.  She was hit in the front.  We know she had some damage to the face. She has brain damage imaged on the CT, and now she's showing evidence functionally of that brain damage on the neuropsychological tests. . . .

. . .

There's nothing else in her medical history which would account for this sort of change in brain tissue.  There's nothing else in her medical history which would account for this sort of impairment of brain functioning.  Both of them are consistent with each other and consistent with a trauma to the front of the head, and we know by medical history she received that.

Q.      And do you attribute that to a particular cause?

A.      The assault that's reported in the medical record, yes.

Trial Tr. at 324:21-325:11, 333:11-20.   While Clodfelter had not, of course, undergone the same battery of tests before the assault, Dr. Bach nonetheless

concluded that she likely would not have been able to "obtain the educational and professional achievement she did" if her capacities for attention, concentration, recall, and nonverbal reasoning had been the same before the assault as they were after it. *Id.* at 343:16-18.

Dr. Bach also correlated the manner in which the assault occurred to the nature of the cognitive deficits he identified. As he said, typically, "[i]f you injure a brain bad enough to get these kind of bad problems up front, you would think you'd have some other problems somewhere else." Trial Tr. at 352:14-16. Clodfelter's problems were atypically highly focalized. He explained:

> Q. In fact, wouldn't the focalness, for lack of a better term or way to say it, wouldn't it depend partially on the mechanism of the injury?
>
> A. It would.
>
> Q. Say being in a car accident and being thrown from the vehicle and hitting your head on a rock versus having someone grab you by the hair and slam your forehead into the – the wall of your home.
>
> A. There was minimal acceleration/de-acceleration injury in the case of this trauma. That may be an explanation why we see only modest decrements in attention, concentration, rather than absolute impairment. That's true.

Trial Tr. at 357:9-20.

Even if no other witness had testified to serious bodily injury, a reasonable

juror could have found serious bodily injury – protracted impairment of the functions and processes of the brain – proven beyond a reasonable doubt by Dr. Bach's testimony alone. This claim should be denied.

### 4. Conclusion

The Montana Supreme Court's decision of these claims was more than reasonable. 28 U.S.C. § 2254(d) precludes federal habeas relief on these claims.

### B. Claims Raised on Postconviction Review

All of the claims in Potter's state postconviction petition asserted ineffective assistance of trial or appellate counsel. As to these claims, both the trial court and the Montana Supreme Court found that Potter failed to comply with, as the State put it, the "demanding pleading and procedural threshold of the postconviction statutes." The Montana Supreme Court held:

> We agree with the District Court that Potter failed to meet his burden to demonstrate by a preponderance of the evidence that his attorney was ineffective, or that any of the attorney's acts or omissions would have resulted in a different outcome. The issues are clearly controlled by settled Montana law, and the District Court's decision to dismiss the petition was not clearly erroneous and was not an abuse of discretion.

Order at 3, *Potter*, No. DA 11-0012.

The state pleading standard is a state procedural requirement. It is not, however, the kind of standard that can give rise to procedural default in federal court.

Procedural default is established only if the state procedural rule is independent of federal law and adequate to support the judgment. *Coleman v. Thompson*, 501 U.S. 722, 735, 740-44 (1991); *Harris v. Reed*, 489 U.S. 255, 260-62 (1989). A state procedural bar is "independent" if its application is not intertwined with an explicit or implicit holding of federal law. *Ake v. Oklahoma*, 470 U.S. 68, 74-75 (1985); *Coleman*, 501 U.S. at 734-35. Determining whether a petitioner's factual allegations, assuming their truth, meet the standards of *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984), is intertwined with federal law. Consequently, the Montana Supreme Court's decision of Potter's postconviction claims on state law grounds does not preclude federal review. *Cf. also Martinez v. Ryan*, __ U.S. __, 132 S. Ct. 1309, 1318 (2012) (holding that ineffective assistance by postconviction counsel or failure to appoint counsel in postconviction proceedings may be "cause" to excuse procedural default).

Where a state court adjudicates federal claims on the merits, § 2254(d) applies. *Lambert v. Blodgett*, 393 F.3d 943, 968 (9th Cir. 2004). "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, __ U.S. __, 131 S. Ct. 1388, 1398 (2011).

It is difficult to decide whether the state pleading threshold, as applied to Potter, "involved an unreasonable application" of federal law under § 2254(d)(1) or

"relied on an unreasonable determination of the facts" under § 2254(d)(2). *See, e.g.*, *Hurles v. Ryan*, 650 F.3d 1301, 1312 (9th Cir. 2011); *Taylor v. Maddox*, 366 F.3d 992, 999-1000 (9th Cir. 2004); *Nunes v. Mueller*, 350 F.3d 1045, 1053-56 (9th Cir. 2003). But it is not difficult to decide Potter's ineffective assistance claims on the merits. Therefore, I will consider the postconviction claims *de novo*.

Claims of ineffective assistance of trial and appellate counsel are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Potter must show both that counsel's performance fell below an objective standard of reasonableness, *id.* at 687-88, and that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. "[T]here is no reason . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

An attorney may "fail to raise an issue because she foresees little or no likelihood of success on that issue." *Miller v. Keeney*, 882 F.3d 1428, 1434-35 (9th Cir. 1989). Provided that assessment is reasonable, neither prong of the *Strickland* test is met. *Id.* A strong measure of deference is due to counsel's strategic decisions that are based on reasonable investigation and knowledge of the applicable law. *Strickland*, 466 U.S. at 690-91. Courts may also consider "obvious countervailing tactical dangers" lurking in the actions the petitioner claims counsel should have

taken. *Gerlaugh v. Stewart*, 129 F.3d 1027, 1035 (9th Cir. 1997) (counsel need not

develop evidence that is "a basket of cobras"). But courts cannot make "a *post hoc*

rationalization of counsel's conduct" without regard to whether counsel actually

recognized and considered viable alternative strategies. *Wiggins v. Smith*, 539 U.S.

510, 526-27 (2003).

### 1. Relationship Between Potter and Clodfelter

Potter alleges that Judnich was ineffective at trial because he failed to

investigate Potter's claim that Clodfelter unethically entered into an intimate

relationship with him while she was working with him as a therapist at the direction

of the State. *See generally* Pet. Supp. at 1-2; PCR Pet. at 6-12. Potter contends that

"[t]he State did everything it could to preclude the Defendant from telling the jury"

about this relationship and "did not want the jury to know" about it. Pet. Supp. at 2.

He complains that Judnich did not oppose the State's March 2006 pretrial motion in

limine to preclude Potter "from discussing or alleging that he had been in a sexual

relationship with the victim," Order Granting Mot. in Limine (doc. 7-21 at <u>19</u>), and

did not appeal the order in limine or allege on appeal his own ineffective assistance

in failing to object in the trial court, Pet. Supp. at 1-2.[6]

---

[6] I have considered, *sua sponte*, that the relationship between Potter and Clodfelter might also have been relevant at sentencing. Mont. Code Ann. § 46-14-311 (2005); *see also* Sentencing Tr. at 479:16-25, 480:6-11. But Potter has never claimed that Judnich should have raised the matter

Potter's state postconviction petition emphasized that evidence of the relationship, and the job consequences he asserts Clodfelter suffered as a result, could have undermined her credibility. *E.g.*, Pet'r Resp. to Mot. to Dismiss (doc. 7-24) at 2-4. Evidence of the relationship may also have suggested a retaliatory motive for Clodfelter to exaggerate her injuries. But this is evidence of the "basket of cobras" kind. Had Potter opposed the motion in limine and insisted on putting Clodfelter's credibility at issue, the State may not have backed down. It might instead have met the challenge by reinstating the original Count 2, assault with a weapon, which depended on Clodfelter's credibility in testifying that Potter showed her a knife and threatened to cut out her tongue. Mont. Code Ann. § 45-5-213(1) (2005); *see also, e.g.*, Trial Tr. at 162:16-163:13. Proof of criminal endangerment, too, would have involved an assessment of Clodfelter's credibility in describing the ferocity of the assault. Mont. Code Ann. § 45-5-213(1) (2005); *see also, e.g.*, Trial Tr. at 180:1-181:23. Additional charges mean additional opportunities for the State to obtain a conviction, and Potter could have been convicted and sentenced on more than one

---

at sentencing. Further, such a claim would rely on an expert witness who could explain how the relationship affected Potter's emotional state and ability to rehabilitate himself, not on the family members and Department of Corrections witnesses Potter says Judnich should have called to establish the relationship and Clodfelter's lack of credibility. Therefore, it is now too late for him to amend his petition to add a claim of ineffectiveness at sentencing. *Mayle v. Felix*, 545 U.S. 644, 659 (2005) ("relation back depends on the existence of a common 'core of operative facts' uniting the original and newly asserted claims").

offense. *State v. Wardell*, 122 P.3d 443, 446 ¶ 18 (Mont. 2005) (citing *Blockburger v. United States*, 284 U.S. 299, 304 (1932)).[7]

Judnich was not ineffective for declining to pursue evidence to undermine Clodfelter's credibility because there were "obvious countervailing tactical dangers." *Gerlaugh*, 129 F.3d at 1035. This claim should be denied.

### 2. Speedy Trial

Potter alleges that Judnich waived his right to a speedy trial just when he should have asserted it – after a delay of eight and a half months had already occurred – and that he did so without giving Potter an opportunity to object or preserve his right. Pet. Supp. at 2-3.

"[T]he right to a speedy trial is a more vague concept than other procedural rights. It is . . . impossible to determine with precision when the right has been denied." *Barker v. Wingo*, 407 U.S. 514, 521 (1972). On the one hand, as delay "approaches one year," the *Barker* analysis is triggered. *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992). On the other hand, "the ordinary procedures for criminal prosecution are designed to move at a deliberate pace." *United States v.*

---

[7] The Montana Constitution provides greater protection against multiple punishments for the same offense than the federal Constitution does. *State v. Guillaume*, 975 P.3d 312, 316 ¶ 16 (Mont. 1999). But the Montana Supreme Court continues to apply the *Blockburger* test to determine whether two crimes are the "same offense." *Wardell*, 122 P.3d at 446 ¶ 18.

*Ewell*, 383 U.S. 116, 120 (1966), *quoted in Barker*, 407 U.S. at 521 n.15. Consequently, there is no federal rule setting forth a specific period of time within which a trial must commence. Instead, the speedy trial test balances various factors, with no one factor being dispositive. *Barker*, 407 U.S. at 533. Courts must consider the length of the delay between charge and trial, the reason for the delay, whether the defendant asserted his right to a speedy trial, and whether he was prejudiced as a result of the delay. *Id.* at 530.

Potter does not identify any prejudice, but he was held in custody before trial. Pretrial detention is inherently prejudicial to some extent, because "[l]engthy exposure to [ordinary jail] conditions has a destructive effect on human character and makes the rehabilitation of the individual offender much more difficult." *Barker*, 407 U.S. at 520 (internal quotation marks and footnote omitted). But there is no indication that Potter's pretrial detention was unusually oppressive or that, detained or not, he suffered an unusual degree of anxiety or concern. *Barker*, 407 U.S. at 532. Although Potter seems to suggest the State might have lost its case if it had tried him sooner,[8] he identifies no impairment to his defense over time. *Id.* The prejudice

---

[8] "Prejudice" does not mean "any benefit to the State from delay." In *Barker*, for instance, a significant portion of the delay was attributable to the State's attempt to convict Barker's accomplice so that it could use his testimony against Barker. The Supreme Court said that "some delay would have been permissible . . . so that Manning could be utilized as a witness in Barker's trial." 407 U.S. at 534. *See also, e.g., id.* at 531 ("a missing witness" is a "valid reason" for delay); 18 U.S.C. § 3163(h)(3)(A).

factor weighs in Potter's favor, but it is slight. I assume as well, for the sake of argument, that he timely asserted his right to a speedy trial to Judnich, if not to the trial court. This factor weighs in his favor as well.

But the length of and the reasons for the delay are decisive in this case. Potter was charged on July 27, 2005, twenty days after the incident. Trial commenced thirteen months later, on August 23, 2006.

On its face, this period of time was reasonable. The nature of the charge matters. *Barker*, 407 U.S. at 531. Here, the pivotal element contemplated "serious permanent disfigurement or protracted loss or impairment of the function or process of a bodily member or organ." Mont. Code Ann. § 45-2-101(66)(a)(ii). That element was at issue for all but the two months between January and March 2006, when the principal charge was criminal endangerment. Proving the element of serious bodily injury and challenging it alike depended on what happened, over time, after the assault. It took time to determine and gather evidence of the extent of Clodfelter's injuries, and it took time for the defense to retain its own experts to review and consider the evidence. There was no way of knowing whether thirteen months' delay would favor the State or Potter; Clodfelter might have improved substantially by the summer of 2006. For that reason, it is clear that the delays – even if, as I find, they

were caused by the State's disorganization and lack of forethought[9] – were not exploitive or designed to hamper the defense, nor did they hamper the defense. *See Barker*, 407 U.S. at 531.

A defendant is not entitled to a perfect trial or a perfect pretrial process, only fairness. The record does not support any inference, however slight, that the delay was unfair to Potter. Had Judnich asserted Potter's right to a speedy trial starting on March 31, 2006, he would have gone to trial without expert assistance, and "no doubt we would be hearing now a claim" that counsel was ineffective for going to trial on March 31. *Gerlaugh*, 129 F.3d at 1035-36. And, had Judnich moved to dismiss the

---

[9] The State filed its Second Amended Information, dropping the previous charges and reinstating the original aggravated assault charge, on March 17, 2006, two weeks before the trial set for March 31, 2006. Minutes (doc. 7-21 at 21). The Second Amended Information listed – for the first time in the case – Dr. Beth Thompson and a registered nurse as potential witnesses. The State misrepresented this fact to the trial court by stating there were no new witnesses. Mot. Hr'g Tr. (doc. 7-21 at <u>28</u> (7:19-21)). Still, Judnich had no choice but to move for a continuance of the March 31 trial date. This continuance was plainly made necessary by the State's shifting strategies.

In addition, the record suggests, though it is not conclusive, that the State did not give notice of Dr. Paul Bach's evaluation or expected testimony until roughly mid-April 2006 (late March at the earliest, Trial Tr. at 354:8-12). In its motion to dismiss the postconviction petition, the State claimed it had been "waiting" for Clodfelter to reach a plateau in her recovery. Mot. to Dismiss (doc. 7-21 at 15) (citing Trial Tr. at 325). But, as Dr. Bach made clear, the plateau was at eighteen months, not eight. Trial Tr. at 325:15-20, 355:5-18. Further, if the State was "waiting" for that reason, it should have disclosed Dr. Bach's name at least on the Second Amended Information. And the State's claim in postconviction that it was "waiting" was inconsistent with its previous position urging the court to hold the trial date of March 31 "unless the time is charged to the defendant." Mot. Hr'g Tr. (doc. 7-21 at <u>25-26</u> (4:17-5:1)).

These facts are troubling. But the bottom line is that the State could reasonably have requested a trial setting of August 23, 2006, on the day it filed the original charge in July 2005. And it could have done so precisely because it was reasonable to "wait" to determine whether or not any impairments Clodfelter suffered were "protracted."

case on speedy trial grounds, the overall balance of factors would not have supported dismissal. This claim should be denied.

### 3. Borg's Testimony

Potter argues that Judnich should have appealed the trial court's decision to allow Margaret Borg to testify. Borg, a public defender, testified after Dr. Bach. She said that she knew Clodfelter in both professional and personal capacities before the assault, and Clodfelter was different after the assault.

The State did not disclose Borg as a potential witness. Apparently there was a discussion about whether she should be permitted to testify, but it took place off the record. *See* Trial Tr. at 363:10-24.[10] Regardless, her testimony was brief, and its impact was slight. She was a close friend of Clodfelter who avowedly declared her bias. Trial Tr. at 364:9-22. Had the case been close, her testimony might have made a difference. This case was not close. There is no reasonable probability that Potter would have been acquitted if only Borg had not testified. This claim should be

---

[10] The State's motion to dismiss the postconviction petition opined that "Borg's testimony would have been allowed as rebuttal to Defendant's cross-examination of the State's expert," because Potter "attacked Dr. Bach's lack of base knowledge of the victim's functioning prior to the assault." Mot. to Dismiss (doc. 7-21 at 13).

"Rebuttal testimony is that which tends to disprove or contradict evidence presented by the adverse party." *State v. Williams*, 604 P.2d 1224, 1231 (Mont. 1979). Cross-examination designed to illuminate potential deficiencies in an expert's assessment is not "evidence presented by the adverse party." Nor did Borg testify that *Dr. Bach* knew the victim's level of functioning prior to the assault. Borg was a witness in the State's case-in-chief.

denied because Potter was not prejudiced by Borg's testimony or Judnich's failure to appeal it.

### 4. Dr. Bach's Testimony

As described above, Dr. Bach's testimony was compelling. Potter's claims that Judnich was ineffective in failing to challenge Dr. Bach's testimony, therefore, require careful consideration.

Potter contends that Judnich should have appealed the trial court's decision to allow Dr. Bach to testify despite an order in limine precluding identification of additional witnesses after February 2006. Potter also claims that Judnich "did not *seek* a *psychiatric* expert in order to defend against the State saying Clodfelter had suffered *psychological* injuries." Pet. Supp. at 5 (emphases added).[11]

First, to appeal the State's late disclosure, Judnich would have had to show that Potter was prejudiced by it. That is, he would have had to provide the Montana Supreme Court with some reason to think Potter could have countered Dr. Bach's testimony, given more time to do so. *State v. Morrisey*, 214 P.3d 708, 732 ¶ 84 (Mont. 2009). Likewise, to show that Judnich should have retained an expert (psychiatric or otherwise) to defend against the State's claim of psychological

---

[11] To the extent Potter means emotional injuries, there is no need to consider the claim. The State did not present competent evidence that Clodfelter's emotional injuries constituted serious bodily injury and did not refer to emotional injuries in its closing arguments.

injuries, Potter must show that such an expert could have been found by Judnich before trial and that his or her testimony would, to a reasonable probability, have resulted in an acquittal. He need not attach to his federal petition an affidavit from such an expert, but he must "set out substantive facts that will enable the court to see a real possibility of constitutional error." *Aubut v. Maine*, 431 F.2d 688, 689 (1st Cir. 1979), *cited in Nicolaus*, 98 F.3d at 1106.

Judnich retained a neurologist, Dr. Williamson, a month before trial, specifically in response to Dr. Bach's expected testimony. *See* Mot. (doc. 7-10); Order (doc. 7-11); Notice (doc. 7-12). Obviously, he did "seek" an expert on brain injury. He did not call Dr. Williamson as a witness, and Potter does not challenge that decision. Judnich cross-examined Dr. Bach about the effects of Clodfelter's discontinuation of her Ambien and Prozac a month before the evaluation, Trial Tr. at 343:19-347:15, but Dr. Bach testified that withdrawal from those medications would not cause the focal cognitive deficits he saw in her test results.

Nothing in the whole of the record, and nothing else of which I am aware, supports an inference that Judnich could have found a neurological, neuropsychological, psychological, or psychiatric expert whose opinion would have been favorable to Potter or critical of Dr. Bach. Certainly Potter is not required to produce such an expert in his petition, but he must allege some facts that suggest such

an expert exists. Cynicism aside, the fact that one expert says "A" is not a reason to believe another expert can be found who will say "B." This claim should be denied because there is no reason to believe Potter could show prejudice under the *Strickland* test.

### 5. Failure to Interview Clodfelter's Doctors

Potter claims Judnich could have discovered many exculpatory medical facts if he had interviewed all the doctors who examined Clodfelter after the assault. Pet. Supp. at 3-4. But, first, the jury was aware of many, if not all, of these facts. *E.g.*, Trial Tr. at 287:18-307:19. And second, the many ways in which Potter did *not* cause serious bodily injury are not probative. Dr. Bach's testimony showed there was at least one way in which he did. This claim should be denied.

### 6. Failure to Disclose CT Scan[12]

Although there was some suggestion at trial that medical reports were missing, Trial Tr. at 192:8-16, 196:10-198:5, the transcript also shows that Judnich knew of the first CT scan, Trial Tr. at 313:7-13, and knowledgeably cross-examined Dr. Bach about the second, *id.* at 348:19-351:16. The State plainly disclosed both CT scans.

---

[12] Potter contends that the discrepancy between the two CT scans (or, more precisely, the radiologist's transcribed reports of the scans' results) matters because "[t]he State's own Doctor states that Clodfelter suffered from ENCEPHALOPATHY earlier in the year of 2005." Pet. Supp. at 6. Potter does not say where this information is found. The radiologist's report of the second CT scan refers to encephalomalacia, *see* July 17 Report, PCR Pet. (doc. 7-20 at <u>30</u>); Trial Tr. at 349:20-350:7, not encephalopathy.

This claim should be denied.

### 7. "Accusatory" Report from Dr. Brewington

Potter claims someone other than Dr. Brewington was allowed to testify "using" Dr. Brewington's "dictated medical report." Pet. Supp. at 5.

Dr. Brewington recorded his observations and medical opinions of Clodfelter's injuries. His report was not made "for the purpose of establishing or proving some fact" and was not a "formalized testimonial" document. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, __, 129 S. Ct. 2527, 2531-32 (2009). It was a medical document designed to memorialize her condition and treatment.

Nor did a witness use Dr. Brewington's report inappropriately. Dr. Bach was entitled to rely on other doctors' reports in formulating his opinion. *See* Mont. R. Evid. 703. Dr. Thompson was entitled to describe Dr. Brewington's report as she described her own observations and opinions as either an expert, *id*., or as a fact witness who had personal knowledge of the report and who relied on it in evaluating her own patient, Mont. R. Evid. 602. This claim should be denied.

### 8. Conclusion

Even on a *de novo* standard, Potter's claims of ineffective assistance of counsel provide no basis for believing there is a reasonable probability he would have been acquitted were it not for the errors of which he complains. These claims should be

denied.

## V. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2254 Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Reviewing the claims Potter raised on direct appeal under 28 U.S.C. § 2254(d), there is no room for reasonable jurists to take a different view of this case. The jury agreed on the highest offense charged, so it did not even consider the proposed lesser charge of attempted aggravated assault. Potter clearly knew what felony underlay the State's proposed persistent felony offender designation. And Dr. Bach's testimony proved serious bodily injury beyond a reasonable doubt. A COA is not warranted on any of these claims because Potter did not make a "substantial showing" that he was deprived of a constitutional right.

Reviewing *de novo* Potter's claims of ineffective assistance of counsel at trial and on appeal, reasonable jurists still would find no "substantial showing" and no basis for encouraging further proceedings. Evidence of the intimate relationship between Potter and Clodfelter was a "basket of cobras" that could have led to reinstatement of the original charges and increased exposure at sentencing. Potter was not deprived of a speedy trial; he was tried thirteen months after he was charged, and the crucial element at issue was whether Clodfelter suffered "protracted" impairment as a result of the assault. It was not unreasonable to wait thirteen months to determine whether that element was met, and counsel was not ineffective for failing to insist on trial at a time when he had had no opportunity to retain an expert witness. Although Margaret Borg should have been identified as a potential witness in the State's case-in-chief, the significance of her testimony paled in comparison to that of other witnesses. Likewise, although the State should have given Judnich notice of Dr. Bach's evaluation and expected testimony before it apparently did, Judnich responded to the State's late notice by retaining his own expert, and there is no reason to believe that he could have found someone to counter Dr. Bach's testimony. Even if Judnich did not interview all of Clodfelter's doctors, the jury was made aware of most of what Judnich would have learned from them, and their reports did not negate Dr. Bach's testimony. The State disclosed both CT scans, so there was

no *Brady* violation, and Dr. Brewington's report was not improperly used by other witnesses. There is no substance to Potter's claims of ineffective assistance. A COA is not warranted as to these claims.

Due to the rather bizarre nature of some of Potter's factual allegations, the State's occasional inaccuracies in its representations to the trial judge, its occasional eliciting of testimony about "reasonable risk" as opposed to "reasonable expectation" of permanent or prolonged impairment, and the importance of expert testimony in this case, I have taken a very careful look at Potter's allegations. The inescapable facts are that Potter repeatedly beat Clodfelter's head against hard surfaces, and, as a result, she suffered significant and protracted, possibly permanent, cognitive impairment. Expert opinion was fully consistent with common sense. I find no reason at all to doubt that Clodfelter suffered serious bodily injury. Potter has never challenged any other element of the offense. Even the best criminal defense lawyers cannot overcome some facts. There is no reason to encourage further proceedings in this matter. A COA is not warranted.

Based on the foregoing, the Court enters the following:

### RECOMMENDATION

1. The Petition (doc. 1) should be DENIED on the merits.

2.  The Clerk of Court should be directed to enter by separate document a judgment in favor of Respondents and against Petitioner.

3.  A certificate of appealability should be DENIED.

### NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATION
### AND CONSEQUENCES OF FAILURE TO OBJECT

Pursuant to 28 U.S.C. § 636(b)(1), Potter may serve and file written objections to this Findings and Recommendation within fourteen (14) days of the date entered as indicated on the Notice of Electronic Filing.  If Potter files objections, he must itemize each factual finding to which objection is made and must identify the evidence in the record he relies on to contradict that finding; and he must itemize each recommendation to which objection is made and must set forth the authority he relies on to contradict that recommendation.  Failure to assert a relevant fact or argument in objection to this Findings and Recommendation may preclude Potter from relying on that fact or argument at a later stage of the proceeding.  A district judge will make a de novo determination of those portions of the Findings and Recommendation to which objection is made.  The district judge may accept, reject, or modify, in whole or in part, the Findings and Recommendation.  Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

Potter must immediately notify the Court of any change in his mailing address by filing a "Notice of Change of Address." Failure to do so may result in dismissal of this case without notice to him.

DATED this 1st day of June, 2012.


 /s/ Jeremiah C. Lynch
Jeremiah C. Lynch
United States Magistrate Judge